**Ernesto CHACON et al., Plaintiffs-Appellants,**

v.

**James D. HODGSON, individually and in his capacity as Secretary of the United States Department of Labor, et al., Defendants-Appellees.**

**No. 71–1189.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 4, 1972.

Decided July 11, 1972.

John F. Ebbott, Robert Sugerman, Milwaukee, Wis., for plaintiffs-appellants.

David J. Cannon, U. S. Atty., Joseph P. Stadtmueller, Asst. U. S. Atty., Milwaukee, Wis., Laurie M. Streeter, U. S. Dept. of Labor, Washington, D. C., Herman Grant, U. S. Dept. of Labor, Chicago, Ill., for defendants-appellees; Gilbert Drucker, Atty., U. S. Dept. of Labor, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SWYGERT, Chief Judge.

This suit concerns the requirements for resident participation introduced by the 1967 Amendments to the Economic Opportunity Act, 42 U.S.C. § 2737 et seq., formerly Title I, § 111 et seq., 78 Stat. 512 (1964). Plaintiffs seek a judgment declaring a regulation of the Manpower Administration of the Department of Labor, Manpower Administration Order 14–69 [hereinafter cited as MAO 14–69], invalid and injunctive relief to prevent the execution of a contract pursuant to it. Cross motions for summary judgment were filed. The district court granted the defendants' motion and dismissed the action.[1] We reverse that determination.

The case involves the operation of the Concentrated Employment Program [hereinafter cited as CEP], authorized in 1967 by 42 U.S.C. § 2740(a) (5). The Act describes the program as "a special program to concentrate work and training resources in urban and rural areas having large concentrations or proportions of low-income, unemployed persons." Administration is lodged with the Department of Labor under a Memorandum of Agreement between the Department and the Office of Economic Opportunity, dated April 12, 1968, and a formal delegation agreement in 33 Fed. Reg. 15139 (October 10, 1968). The program is carried out through contracts between the Department of Labor and local "prime sponsor" agencies, which are usually community action agencies set up under Title II of the Act, 42 U.S.C. § 2790. The prime sponsor is required to provide overall planning while the actual operation of the program is subcontracted to "delegate agencies." Participation

1. The district court's decision is reported at 323 F.Supp. 291 (E.D.Wis.1970).

of area residents is a prerequisite at both levels under section 2739(d):

> The prime sponsor and delegate agencies shall provide for participation of residents of the area and members of the groups served in the planning, conduct, and evaluation of the comprehensive work and training program and its components. Such persons shall be provided maximum employment opportunity in the conduct of component programs, including opportunity for further occupational training and career advancement.

Plaintiffs claim that the organization of the CEP program now mandated by MAO 14–69 contravenes this requirement.

In June 1968, prior to the issuance of MAO 14–69 and immediately following the effective date of the 1967 Amendments, the Department of Labor negotiated a contract with the Milwaukee County Community Relations-Social Development Commission [CR–SDC], a community action agency. Actual operation of the program was then to be subcontracted to the Resident Board of Directors for CEP, a non-profit corporation composed of elected area residents, and to other agencies, including the Wisconsin State Employment Service. The Resident Board's role was substantial: It operated the major components of the CEP program.[2] The Resident Board also directly influenced the CEP activities conducted by the State Employment Service since the CEP coordinator who was in charge of all subcontracted programs was directly accountable to the Board.

Prior to the expiration of this contract in August 1969, MAO 14–69 was released. The regulation, entitled "Outline for Renegotiation of CEP Contracts and Continuing Management of CEP's," proposed consolidation of all CEP manpower services into one package that would be subcontracted as a unit to the State Employment Service. It recommended that only four components of the package be subcontracted to other agencies.[3] However, substantial control over all activities would remain in the State Employment Service. A manpower services director, to be appointed by the State Employment Service, was to be given full control over all employees [4]—whether within the Employment Service or other subcontracting agencies—who worked "on a full or more than 50% time basis" on tasks that were within the manpower services subcontract. Resident participation was included in the proviso:

> In conducting the manpower services, the employment services shall employ subprofessionals—including the poor —in the planning, conducting, and evaluation phases.

The term of the original Milwaukee CEP contract was extended as negotiations continued between the Department of Labor and the CR–SDC for a new contract. In May 1970 a contract acceptable to the Department of Labor was proposed which embodied all the requirements of MAO 14–69 including the proviso that "subprofessionals—including the poor—be included in the planning, conducting, and evaluation of the CEP contract." In addition, resident participation was provided for by the requirement that fifty percent of the State Employment Service staff performing work under the CEP subcontract be residents of the area served by the program.

---

2. Manpower services under the CEP program were administered in ten component parts: outreach, intake, orientation, assessment and counseling, coaching, referral to employability development services, referral to supportive services, job development, placement, and intensive follow-up. Under the first contract four components were subcontracted to the Wisconsin State Employment Service, and six to the Resident Board.

3. The four components consisted of outreach, orientation, coaching, and intensive follow-up. They were to be subcontracted to the Inner City Development Project, which operates a network of neighborhood centers, and the Resident Board.

4. Only two employees paid from a portion of the program characterized as "supportive services" remained under the control of the Resident Board.

At this point, the instant suit was filed. Plaintiffs are residents whose role in the program is alleged to have been substantially diminished because of compliance with the new regulation. They are residents who were involved in the planning activities of the Resident Board under the first contract, the chairman of the resident board, an enrollee of the program and a resident on the staff of one of the CEP programs. The defendants are the Department of Labor and its secretary, the regional manpower administrator who is the contracting officer for the Department of Labor in the area, the Office of Economic Opportunity and its director, and the Department of Health, Education and Welfare and its secretary.[5]

■■ A preliminary issue raised by the defendants is mootness. Appellate courts may properly consider facts arising since the lower court's adjudication that may cast doubt on the continuing justiciability of the controversy. Atherton Mills v. Johnston, 259 U.S. 13, 42 S.Ct. 422, 66 L.Ed. 814 (1922). The plaintiffs concede the following facts: Signing of the May 1970 contract and subcontract had been postponed pending the outcome of the plaintiffs' suit in district court. Following the decision of that court, negotiations were renewed and resulted in the execution of a prime contract and subcontract incorporating the contested provisions of MAO 14–69. However, we fail to see how this act moots plaintiffs' appeal since the action challenges the regulation which remains in effect. The Department of Labor continues to condition execution of each contract and subcontract on compliance with MAO 14–69. The contracts are for a fixed term and necessitate yearly renegotiation. Accordingly, the controversy remains justiciable, and both declaratory and injunctive relief is proper.

The question before us is whether MAO 14–69 violates the participation requirements of 42 U.S.C. § 2739(d). Both sides have advanced ambiguous interpretations. The plaintiffs state that section 2739(d) requires two kinds of participation by target area residents: Firstly, employment in the conduct of the component programs and, secondly, participation in the "planning, conduct and evaluation" of the programs. Though they repeatedly cite to the first contract executed by the CR–SDC as one which fulfilled these requirements, we do not find that their position necessitates a continuation of total resident control. They speak of the "meaningful participation" of area residents in planning decisions as the means of fulfilling the "planning" requirement. We assume this means that prior to awarding a subcontract, the delegate agency should be required to show how planning decisions are made and by whom, and the specific mechanisms it had provided or would provide to guarantee resident participation in this process. Plaintiffs' interpretation does, however, seem rigid in one respect. Their emphasis on the distinctiveness of the two modes of participation indicates that while the employment requirements might be fulfilled by hiring residents in a variety of positions, the planning requirement must be fulfilled by a body of residents who are not employed in the program. This suggests, for example, that an organization of residents, be convened regularly to either advise the principal policy-makers or further, to exercise some voting rights. Hence, under plaintiffs' interpretation, MAO 14–69 fails because it assigns control to the Wisconsin State Employment Service and that agency, though it employs some area residents, has had no comparable procedures for resident participation in planning decisions in the past, nor is it required by contract to so provide in the future.

The defendants state that the employment of residents alone can fulfill both

---

5. Though principal responsibility for the administration of the CEP program rests with the Department of Labor, the Office of Economic Opportunity has some supervisory functions under 42 U.S.C. § 2942, as does the Department of Health, Education and Welfare under 42 U.S.C. § 2925.

the "employment" and the "planning" requirements of section 2739(d). They never specify, however, what type of employment they take to be sufficient. Their interpretation of "participation in the planning, conduct, and evaluation" of programs would be exceedingly broad if employment in any position—including a typist or a file clerk—were adequate under this section. We must assume that they would require some assurance that area residents be hired in more than menial roles though, apparently, very little more. They would not, for instance, require a showing that the delegate agency had institutionalized resident participation by fixing a specific percentage of area residents in policy-making capacities or by the creation of a resident advisory board. Accordingly, they find adequate the assignment of control to the State Employment Service in MAO 14–69 with the sole proviso that the Service employ subprofessionals, including the poor, in the planning, conducting and evaluation phases of the program.

Upon analysis of the language of the section, we find that it sets up two distinct modes of participation for area residents, and further, suggests different justifications for each mode. The overall participation requirement is described in two sentences. The first sentence refers to participation of residents in "the planning, conduct, and evaluation of the comprehensive work and training program and its components." The second sentence requires that residents be "provided maximum employment opportunity in the conduct of component programs, including opportunity for further occupational training and career advancement." The first sentence suggests a policy of providing residents with the means of making their views reflected in the program, while the second sentence focuses more narrowly on employment opportunities that would equip residents with a variety of skills in the administration of a work and training program. To begin with, the first sentence delineates the functions residents are required

to participate in, each of which is central to policy-making—planning, conduct and evaluation. The second sentence, however, is more general and speaks of providing "employment opportunity" in the "conduct of component programs." The first sentence relates participation in planning, conduct and evaluation to both the component programs and to the comprehensive work and training program itself, while the second sentence restricts the employment requirement to the component programs. Formulation of the comprehensive work and training program is a critical stage in the process since it is the point at which the community's basic manpower priorities are fixed and resources are allocated. *See* 42 U.S.C. § 2738. Finally, the training orientation of the second sentence is underscored by the proviso that employment include "opportunity for further occupational training and career advancement."

The legislative history of the Act buttresses the interpretation that two distinct kinds of participation are involved. In their "Section-by-Section Analysis" of the 1967 Amendments, both the House and Senate reports summarize section 2739(d) by adding the word "also" to the second sentence: "Residents must *also* be provided maximum employment opportunity in the conduct of component programs." H.R.Rep.No.866, 90th Cong., 1st Sess. 41 (1967); S.Rep.No.548, 90th Cong., 1st Sess. 87 (1967); U.S.Code Cong. & Admin.News, p. 2468 [emphasis added].

Furthermore, congressional reports develop in greater detail the two different rationale—training and representation—for resident participation. A major theme of the 1967 Amendments was the importance of adequately representing local residents in Economic Opportunity Act programs. The manpower programs under Title I–B, including the CEP, were to be coordinated through one agency and that coordination was to take place at "the most meaningful level," the local community. S.Rep.No.548, 90th Cong., 1st Sess. 27 (1967). Coordination

at the local level was characterized as "meaningful" in part because local agencies could easily mobilize community resources and thus, would have a great impact on the lives of local residents. Centering the program in local communities would also provide opportunities for residents to make their views known and enable the program to respond to local needs. S.Rep.No. 548, 90th Cong., 1st Sess. 29 (1967); H.R.Rep.No.866, 90th Cong., 1st Sess. 8, 15 (1967). The community action agencies provided for in Title II were presumed most likely to act as "prime sponsors" for the work and training programs under Title I–B, S. Rep.No.548, 90th Cong., 1st Sess. 28 (1967), and the 1967 Amendments had provided these agencies with specific mechanisms for the representation of area residents. 42 U.S.C. § 2791. Finally, in Title II, we can identify the concern with resident representation with the specific language used in the first sentence of section 2739(d). Section 2791 (c), which is addressed to providing mechanisms for the representation of all local interests in any local agency to which the community action agency has delegated a major policy role, includes the sentence: "Each community action agency shall be encouraged to make use of neighborhood-based organizations composed of residents of the area . . . to assist such agency in the planning, conduct, and evaluation of components of the community action program."

A concurrent theme of the Title I–B work and training programs, in particular, was the importance of developing local skills in administration in addition to general job training. The Title was to provide the poor with work and training opportunities and one obvious source of employment was within the programs themselves. Moreover, it aimed at stimulating local initiative in generating and administering new manpower projects, a prerequisite of which was providing residents with concrete experience in the conduct of the programs. 42 U.S.C. § 2737.

Our interpretation of the legislative history and the language of the section suggests that these two rationale, representation and training, have found expression in section 2739(d) in the form of two different models of participation. Employment of the poor in a variety of positions as mandated by the second sentence of the section readily fulfills the training rationale. However, adequate representation of residents' views requires more elaborate provisions, as the first sentence suggests. In order that residents' views be reflected in the program, well-defined mechanisms for participation must be set up with a guarantee that those mechanisms operate on policy-making processes in the delegate agencies.

■ Administrative pronouncements issued immediately after the 1967 Amendments became effective lend support to this interpretation. We may give special credence to the "contemporaneous construction" of a statute by the administering agency. FTC v. Mandel Bros., 359 U.S. 385, 391, 79 S.Ct. 818, 3 L.Ed.2d 893 (1958). In the delegation agreement executed between the Office of Economic Opportunity and the Department of Labor of April 12, 1968, the Department was specifically directed to articulate criteria for resident participation in the prime sponsor agencies and delegate agencies of the CEP program. Elsewhere the agreement calls upon the Department to require that maximum employment opportunities for residents be provided for by prime sponsor and delegate agencies without, however, directing the Department to issue specific standards in this area.[6] In a regulation is-

---

6. The agreement requires that the Department of Labor, in conjunction with the Office of Economic Opportunity, develop policies covering:

    1) definition of community program area; 2) prime sponsorship designa- tion and role; 3) criteria for resident participation; 4) criteria for participant eligibility; 5) supportive services; and 6) consolidation of comprehensive work and training programs.

sued by the Department of Labor soon after this agreement, MAO 12–68 (October 9, 1968), standards for the representation of area residents in prime sponsor and delegate agencies were articulated. The regulation requires that the governing board of the community action agency, one-third of which was to be composed of area residents, also serve as the "policy level participatory body" for the delegate agency. At the same time, in a different section of the regulation, the admonition to hire area residents was repeated in as general terms as it had been in the delegation agreement.[7]

█ We thus agree with the plaintiffs to the extent that they suggest that resident participation in planning—unlike the employment requirement—must include a defined, institutionalized role

in policy-making. However, we see nothing in the Act to require, as the plaintiffs suggest, that the policy-making body be wholly composed of nonemployee residents. Indeed, employees of the delegate agency in policy-making jobs could play a more direct role in decision-making than an adjunct nonemployee board. At the same time, a vague promise of future employment in some undefined "planning" related jobs would fail to provide the institutionalized participation the Act requires. Institutionalized participation in planning suggests provisions like a nonemployee resident board with a defined role in policy decisions or a fixed percentage of residents employed in higher level policy-making positions.

We turn now to a more detailed analysis of the contested regulation.[8] The

---

7. MAO 12–68 included a section entitled, "Community Participation." Part (1), "Participation by Representatives of the Poor," provided:

It is the basic, continuing and legally binding responsibility of each PS [prime sponsor] to provide for an effective administrative structure which ensures that representative members of the groups being served . . . have direct access to and participate in the decision-making process involving planning, conduct and evaluation of a CW TP [Comprehensive Work and Training Program] and its program components.

(a) Agencies governed or administered by a board of which at least one third of the members are democratically selected from the groups to be served, shall meet this requirement. In all cases where a prime sponsor is not so structured, it should establish a special board which includes, as at least one third of the membership, democratically selected representatives of the areas to be served. Those special boards should be given responsibility for overseeing the planning, conduct and evaluation of the CWTP and its components.

(b) The governing or special board referred to above should also serve as the policy level participatory body for delegate agencies required by Section 122 of the EOA [Economic Opportunity Act], through one of the following optional arrangements:

(i) The board should appoint a subcommittee composed of appropriate representatives of the governing or special board to serve each delegate agency in an advisory capacity or,

(ii) The board should establish a "delegate agencies advisory board" composed of selected members of the governing or special board and a representative from each delegate agency.

*     *     *     *     *

(5) *Employment of the Poor*

The PS [prime sponsor] and delegate agencies shall provide maximum employment opportunities for resident poor . . . including elderly unemployed and underemployed, in the conduct of component programs. This employment shall include opportunity for occupational training and career development, and upgrading, with funds made available for this purpose.

8. MAO 14–69 provides in pertinent part: The employment service will be expected to provide under subcontract (and thus be totally and fully responsible for the administration and control of) the manpower services package. These manpower services are defined as:

—outreach
—intake
—orientation
—assessment and counseling
—coaching
—referral to employability development service, including training
—referral to supportive services
—job development
—placement

If the negotiations between the prime sponsor and the State director of the

regulation directs the prime sponsor to subcontract to the employment service the entire "manpower services package" thus making the employment service "totally and fully responsible for the administration and control of" CEP manpower services. The only exception to this requirement relates to four components of the program which may be handled either by subcontract between the employment service and another agency, or by the prime sponsor directly, or by subcontract between the prime sponsor and another agency. If control of these components is not waived, the employment service director remains "fully and completely responsible" for the entire package. Even if these components are subcontracted, the employment service retains control by dint of the office of manpower services director, an official responsible to the state employment service director and to the prime sponsor agency. The manpower services director has "full control and direction of *all* employees—ES [employment service] or other subcontractor employees—working on a full or more than 50% time basis on tasks that are shown in the manpower delivery services subcontract as being a part of the package." Finally, resident participation is mentioned only in the requirement that the employment service "employ subprofessionals—including the poor—in the planning, conducting, and evaluation phases."

In the April 12, 1968 delegation agreement between the Department of Labor and the Office of Economic Opportunity, the state employment service was described as the "presumptive supplier of manpower services, if it met the requirements of § 122(d) [42 U.S.C. § 2739 (d)]." While MAO 14–69 altered this by specifically directing that the state employment service exercise control, that fact alone need not suggest an administrative change in the participation standard. MAO 14–69 is to be interpreted in the light of other regulations issued pursuant to the Act. Arguably, in actual negotiations with local agencies, the Department of Labor could in fact permit the subcontracting of manpower services only to those state employment services that actually complied with the Act's requirements for delegate agencies or that

employment service suggest to the RMA [Regional Manpower Administrator] that other agencies—such as the CAA [Community Action Agency]—can better or more easily perform
  —outreach;
  —coaching;
  —orientation; or
  —intensive follow-up
these activities may be handled through subcontract with the employment service, by the prime sponsor directly or through a subcontract.

\*    \*    \*    \*    \*

The manpower services are to be considered as an interrelated whole and are to be subcontracted—under most conditions to the employment service— as an interrelated group. . . .

\*    \*    \*    \*    \*

There is to be a single employment service director fully and completely administratively responsible for the complete manpower delivery system in each CEP [Concentrated Employment Program] where the package is subcontracted to the employment service. Where any or all of the optional functions (outreach, coaching, orientation) are excluded from the package they will, of course, be under the administrative control of the appropriate subcontractor, except as indicated in the next paragraph.

The director of the ES [employment service] manpower services package is to be administratively responsible to the State ES director (or similar appropriate official of his own State agency) and responsible to the CEP director for carrying out his duties within the terms and conditions of performance as described in the subcontract. The ES manpower services package director will have full control and direction of *all* employees—ES or other subcontractor employees—working on a full or more than 50% time basis on tasks that are shown in the manpower delivery services subcontract as being a part of the package.

\*    \*    \*    \*    \*

In conducting the manpower services, the employment services shall employ subprofessionals—including the poor— in the planning, conducting and evaluation phases.

gave authoritative assurances of future compliance.

An evaluation of how MAO 14–69 has affected the participation requirement thus requires analysis of the contracts approved by the Department of Labor immediately after issuance of the regulation. The Department's actions at this time constitute an authoritative interpretation of its own rule. Indeed, this is especially so in the light of the significance that MAO 14–69 itself attaches to the contract negotiation process. The regulation specified that the contract negotiations were to be the principal means of supervising the operation of the CEP programs, and of delineating the "acceptable standards of operation."

In the instant case, four proposals were submitted to the Department of Labor after the contract of June 1968 was scheduled to expire. The first proposal, which was substantially like the previous contract, was rejected by the Department for failure to conform to MAO 14–69. Subsequent proposals were rejected for failing to place control of all employees working on a full or more than half-time basis on program activities in the hands of the manpower services director. Finally, in May 1970, the fourth proposed contract which restated all the requirements of MAO 14–69, was accepted by the Department of Labor. All manpower services, outside of the four waived components, were subcontracted to the Wisconsin State Employment Service. All employees working on a full or more than half-time basis on CEP tasks were under the control of a manpower services director appointed by the Wisconsin State Employment Service. The Wisconsin State Employment Service was required to "employ subprofessionals—including the poor—in the planning, conducting, and evaluation" of the program. The only requirement of the contract which was absent in the regulation was the following:

(a) No less than 50% of contractor's staff employed in the performance of this contract, (excluding job coaches) shall be residents of the target area

served by the Concentrated Employment Program funds under this contract, and the contractor agrees that any subcontract(s) hereunder shall require the subcontractor to hire no less than 50% of its staff, excluding job coaches, for the performance of work under such subcontracts from among residents of the target area served by the Concentrated Employment Program.

The basic framework of our analysis of MAO 14–69 is then quite simple: If the Wisconsin State Employment Service actually meets the requirements for delegate agencies under the Act, or if the above contractual provisions would have been adequate to assure future compliance, then the regulation's assignment of control to the Employment Service is valid. If the Employment Service presently fails to meet these requirements, and has failed to provide guarantees of future compliance, then conformance with MAO 14–69 has effected a diminution of resident participation below the standards of the Act and the regulation is invalid.

The contractual provisions dealing with participation in the May 1970 contract which we take to represent the contract standards acceptable to the Department under MAO 14–69 are clearly inadequate under section 2739(d). Though employment participation may be insured, participation in planning is not. The provision derived from the regulation which speaks only of the employment of "subprofessionals—including the poor" is vague. The first sentence of section 2739(d) specifically requires participation in policy-making by "residents of the area and members of the groups served." Moreover, that provision contains an indefinite promise of some role in policy-making in the future, rather than an outline of the kinds of mechanisms required by the section. The provision requiring fifty percent of the state employment service's staff to be composed of residents of the area also fails to meet the representational requirements of the first sentence of sec-

**316**

tion 2739(d) since no policy-making roles are specified. If file clerks and typists are considered part of the quota, this provision can hardly be said to insure a regularized role for residents in policy-making.

■ Since the contract provisions are inadequate to insure future compliance, the validity of the regulation hinges on the present operation of the Wisconsin State Employment Service.[9] As to this issue, unresolved factual questions remain. Accordingly, we reverse the district court's grant of summary judgment to the defendants, and remand for a hearing on whether the Wisconsin State Employment Service's current operations conform to the standards required by section 2739(d) of the Economic Opportunity Act.

HASTINGS, Senior Circuit Judge (dissenting).

The issue in this case is whether Manpower Administration Order 14–69, issued by the Department of Labor, and the subcontract between the Milwaukee County Community Relations-Social Development Commission and the Wisconsin State Employment Service executed pursuant to that order, provide for sufficient "resident participation" as required by Title I–B of the Economic Opportunity Act.[1]

I agree with the majority that resident participation, which is required by 42 U.S.C.A. § 2739(d), does not mean resident control or veto power over policy making. I also agree that section 2739(d) establishes two distinct modes for resident participation, namely, participation by local residents in "the planning, conduct, and evaluation of the comprehensive work and training program and its components" and, in addition,

participation through maximum employment of area residents in the operation of the programs. My disagreement stems from the majority's conclusion that MAO 14–69 and the proposed contract with WSES do not satisfy the requirements of section 2739(d).

Section 2739(d) requires: "The prime sponsor [CR–SDC] and delegate agencies [under the proposed contract WSES] shall provide for participation of residents of the area and members of the groups served in the planning, conduct, and evaluation of the comprehensive work and training program and its components. Such persons shall be provided maximum employment opportunity in the conduct of the component programs, including opportunity for further occupational training and career advancement."

The Department of Labor's order, MAO 14–69 is intended to implement the above requirements and provides, *inter alia*, that: "In conducting the manpower services, the employment service [WSES] shall employ subprofessionals—including the poor—in the planning, conducting and evaluation phases." The proposed contract with WSES requires, in addition, that: "No less than 50% of contractor's staff employed in the performance of this contract, (excluding job coaches) shall be residents of the target area served by the Concentrated Employment Program funds under this contract * * *." I agree with the district court below that the above provisions satisfy the requirements of section 2739(d), in that they provide maximum employment for residents of the target area served by the CEP program, as well as meaningful resident participation in the planning, conduct and evaluation of the program.

In interpreting section 2739(d) and the Department of Labor's implementing

---

9. The district judge eschewed consideration of the past or present activities of the State Employment Service because he found the regulation and the contract interpreting it to be adequate under the Economic Opportunity Act. Hence inquiry would have been limited to whether the State Employment Service would comply with its own contract, an inquiry obviously not ripe for decision.

1. Abbreviations used in the dissent correspond to those used by the majority.

order and proposed contract we should be mindful that it is the Department of Labor which is charged with administering the CEP program under the Economic Opportunity Act.[2] I feel that the majority has read the MAO 14–69 requirements for resident participation too narrowly and has failed to give due regard to the discretion vested in the Department of Labor. We should not presume that the Department of Labor, in derogation of the Economic Opportunity Act, would strictly construe MAO 14–69 to merely require resident participation by the equivalent of clerks and typists. Until such construction is placed upon MAO 14–69, there has been no cognizable violation of section 2739(d).

Of course, as the district court pointed out, should WSES fail to provide meaningful resident participation as required by the Economic Opportunity Act and as interpreted by the courts, then its contract would be subject to termination under MAO 14–69 and it would be subject to judicial action by concerned target area residents.

With deference, I do not understand how the majority, notwithstanding its finding that MAO 14–69 and the proposed contract are inadequate under the Economic Opportunity Act, can nevertheless suggest that the order's validity can be sustained if WSES's present actions are in compliance with the Act. To me the validity of the order and of the proposed contract depend upon their adequacy under the Economic Opportunity Act and are questions of law. In my judgment, the question of present or future compliance with the requirements of the Act by WSES, if it ever arises, is the subject of another lawsuit.

In sum, it is my view that the district court properly determined the issues presented by the pleadings on summary judgment, and I would affirm upon the authority of its well considered opinion reported at 323 F.Supp. 291 (D.C., 1970).

2. Although the Economic Opportunity Act vests in the Office of Economic Opportunity and its director authority to administer the Act, 42 U.S.C.A. § 2941, et seq., the Department of Labor is authorized to administer part of Title I–B of the Economic Opportunity Act (in particular the CEP program) under a Memorandum of Agreement, dated April 12, 1968, and the formal Delegation of Authority between the Department of Labor and the Office of Economic Opportunity. 33 Fed.Reg. 15139.